# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| EDWARD OVERSTREET, | 1:04-CV-05799 LJO JMD (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES A. YATES, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is confined by the State of California, pursuant to a judgment of the Superior Court of California, County of Tulare. On November 14, 2002, following a jury trial, Petitioner was convicted of continuous sexual abuse (Cal. Pen. Code § 288.5) and sentenced to twelve years in state prison.

1

1   On April 17, 2003, Petitioner timely filed an appeal in the California Court of Appeal,
2  Fifth Appellate District (hereinafter "Fifth DCA"). On February 13, 2004, the Fifth DCA denied
3  Petitioner's appeal and affirmed the judgment of the Superior Court.
4   Petitioner filed a Petition for Review in the California Supreme Court on March 22, 2004.
5  The petition was denied on April 28, 2004.
6   On November 5, 2004, Petitioner filed a Petition for Writ of Habeas Corpus in the Tulare
7  County Superior Court. The petition was denied on November 9, 2004.
8   On November 22, 2004, Petitioner filed a Petition for Writ of Habeas Corpus in the Fifth
9  DCA. The Fifth DCA denied the petition on December 20, 2004.
10   On December 28, 2004, Petitioner filed a Petition for Writ of Habeas Corpus in the
11  California Supreme Court. The petition was denied on November 16, 2005.
12   On June 4, 2004, Petitioner filed a Petition for Writ of Habeas before this Court. On
13  October 15, 2004, Respondent filed a Motion to Dismiss the Petition. Petitioner filed an
14  opposition to Respondent's Motion to Dismiss and Request for Leave to Amend the Petition on
15  October 25, 2004. This Court granted Petitioner's Motion for Leave to Amend the Petition to
16  withdraw all unexhausted claims on December 29, 2004, and denied Respondent's Motion to
17  Dismiss on February 8, 2005.
18   On November 23, 2005, Petitioner filed a Motion for Leave to File an Amended Petition
19  for Writ of Habeas Corpus before this Court. The motion was granted on November 30, 2005.
20  On March 8, 2007, Petitioner filed an Amended Petition for Writ of Habeas Corpus. Respondent
21  filed its Answer on August 8, 2007, and Petitioner filed a Traverse on August 20, 2007.

**FACTUAL BACKGROUND**

**Prosecution Evidence**

In December of 1998, Carrie Arnold (the victim's mother) lost her job and was without any means of supporting herself and her four children. She sent two of her children, the victim and her son, Theron, to live with Theron's father, Darrell Overstreet. (RT 157-159). At that time, Petitioner, who is Darrell Overstreet's brother, also lived in the house. (RT 73). Although Petitioner was not technically her uncle, the victim referred to Petitioner as "Uncle Ed." (RT 73). The victim would go into Petitioner's bedroom to talk to him. (RT 79). Petitioner began touching the victim "inappropriately" during the summer before she began fourth grade. (RT 78, 83). The victim testified she learned about good versus bad touching at school and heard the word "inappropriately" from her

father and from teachers at school.  (RT 78).
    The victim testified Petitioner touched her approximately once per week while they were in his bedroom.  (RT 79, 84).  Petitioner would rub and squeeze the victim, touched her breasts underneath her clothing and on one occasion Petitioner inserted his fingers into her vagina while she sat on his lap.  (RT 81-82, 84-85).  The victim testified that it hurt when Petitioner put his fingers inside her vagina and she fell from his lap.  After she got up, Petitioner removed his fingers from her vagina and put them in his mouth.  (RT 85-86).
    The victim testified that one day while laying on the floor of Petitioner's bedroom doing her schoolwork she saw Petitioner touching his penis, which was pointed away from his body.  (RT 87-88).  She could not recall specifically, but testified that she knew she had seen Petitioner's penis on other occasions after that day.  Petitioner also showed the victim pictures of naked women.  (RT 89).
    The victim testified that when she returned home from school each day Petitioner was home "maybe four days a week."  (RT 110).  The victim stated she liked Petitioner and felt he was the only person she could talk to, but that she did not like when he touched her.  (RT 140).
    Beginning in 2001, the victim went to live with her father, Ronald Wilson. (RT 35, 220).  Petitioner had stopped touching her prior to her departure.  (RT 90).  The victim was unsure, but believed her counselor was the first person she told about Petitioner touching her.  Later she told a police officer who videotaped her statement.  (RT 92-93).  The victim admitted that she lied when she told the police officer that Petitioner had pulled her into his bedroom.  (RT 126, 143).  She testified that she lied because after she understood what Petitioner had done to her she did not like him anymore.  (RT 142-143).  She maintained that she was not "making it up about [Petitioner]."  (RT 138).
    The victim's father was present during the police interview.  He did not ask or tell her to lie.  (RT 138).  The victim had told her father that Petitioner put his fingers inside her vagina prior to her testimony at trial.  (RT 95).
    The victim's stepmother, Carol Wilson, testified that during the summer of 2000 she drove to Tulare County to pick the victim up for a weekend visit in Santa Barbara County.  (RT 215-217).  Wilson testified that during the drive the victim became frightened at seeing a missile launch from a nearby Air Force Base. Wilson tried to comfort the victim by telling her that it was okay to be afraid, and that adults had fears too.  The victim then stated: "What I am afraid of is Ed and a chest he has with porno, that's what I am afraid of."  (RT 217-218).
    In July of 2001, Tulare County Sheriff's Sergeant Rodney Klassen conducted a "CART" (Child Abuse Response Team) interview of the victim.  (RT 52).  As a result of the interview a search warrant was served at Petitioner's residence.  (RT 53).  In Petitioner's room deputies found a blue chest the contents of which included several magazines containing depictions of nude women.  (RT 56, 64).
    Registered Nurse Georgeanne Greene performed a sexual assault examination on the victim.  (RT 10).  Greene had received specialized training including specifically performing such exams on children.  She had conducted approximately 350 pediatric sexual assault examinations.  (RT 11-12).  Greene's examination of the victim revealed that she had a scar crossing the posterior fourchette and a notch or tear in the hymen.  (RT 17).  Greene's training taught her to distinguish normal anomalies in the hymen from injuries.  She testified that the condition of the victim's hymen was consistent with penetration.  (RT 19). Greene explained that before puberty the hymen is extremely touch-sensitive, and is thin and fairly easily injured.  (RT 22).  She testified that any injury would not likely occur from activities such as falling on a bike rail, off a fence, or falling on monkey bars because the hymen is deeper inside.  (RT 23).  Greene testified that an injury like the victim's could occur if a child fell on a sharp toy or sharp object

with legs spread in an exact position so as not to injure any other part of the genitalia. (RT 30).

The victim told Greene Petitioner had "put his finger in her privates." The victim stated that it hurt when he did so, and that later it was painful when she urinated. (RT 20-21). The victim told Greene that no one other than Petitioner had ever touched her inappropriately. (RT 29).

Greene testified that she had examined approximately 250 girls who complained of vaginal penetration. She had not examined girls who did not complain of sexual assault, but had seen photographs of the genitalia of such children. The condition of the victim's genitalia was not consistent with that of a child who did not complain of having been sexually assaulted. (RT 32-33).

Greene testified that she had not asked the victim if she masturbated. However, she believed it unlikely the injury was caused by masturbation because female masturbation involves the clitoral hood at the top of the genitalia, not the area deep down where the tear in the victim's hymen was. Moreover, Green testified that most children at the victim's age would not touch themselves there because it would be so painful. (RT 21, 34).

**Defense Evidence**

Petitioner testified that the victim's allegations of molestation were untrue. (RT 223, 231). Petitioner moved back into the family home in May of 19999 after his father passed away. (RT 224). The victim was also living in the home at that time. (RT 228). Petitioner began attending school. He attended classes every day from 7 a.m. to 3:30 p.m. (RT 229). After school Petitioner would go over to his cousin's house or to his grandmother's house and would not return home until after dark. (RT 229-230). After completing his classes, Petitioner found a job and worked every day from 7 a.m. to 3:30 p.m. (RT 231). He would return to the house each evening at approximately 7:30 p.m. (RT 233).

Petitioner testified that he was not around the children very often during the week and was never alone with the victim. He also testified the victim never came into his room with any problems or sat on his bedroom floor doing her homework. (RT 238).

Detective Steve Robel's testimony was admitted by party stipulation and read into the record by the prosecutor. (RT 272). The victim told Detective Robel that Petitioner had touched her breast and crotch areas approximately 15 to 20 times over a two-year period. She told him that Petitioner would take her into his bedroom, have her sit on his lap, and show her nude pictures of women. The victim stated that Petitioner did not touch her underneath her clothing. (RT 273-275). The victim said that on one occasion Petitioner tried to force her to touch his penis, but she pulled away. The victim told Detective Robel that Petitioner kept his pornographic magazines in a blue chest located in his bedroom. (RT 275). The victim believed Petitioner had last touched her around September of 2000, about three months before she moved out of the house to live with her father. (RT 276). The victim told Petitioner's mother that Petitioner had shown her pornographic magazines, but Petitioner's mother did not believe her. (RT 276).

///

///

///

///

**DISCUSSION**

I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. **Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28

1  U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

2  As a threshold matter, this Court must "first decide what constitutes 'clearly established
3  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at
4  71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court
5  looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the
6  relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
7  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth
8  by the Supreme Court at the time the state court renders its decision." Id.

9  Finally, this Court must consider whether the state court's decision was "contrary to, or
10 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
11 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
12 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
13 Court on a question of law or if the state court decides a case differently than [the] Court has on a
14 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.
15 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
16 state court identifies the correct governing legal principle from [the] Court's decisions but
17 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at
18 413.

19 This Court may not issue the writ simply because in its independent judgment the state
20 court decision applied clearly established federal law erroneously or incorrectly; for a writ to
21 issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making
22 the "unreasonable application" inquiry should ask whether the state court's application of clearly
23 established federal law was 'objectively unreasonable." Id. at 409.

24 Petitioner has the burden of establishing that the decision of the state court is contrary to
25 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
26 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the
27 states, ninth circuit precedent remains relevant persuasive authority in determining whether a
28 state court decision is objectively unreasonable. See Duhaime v. DuCharme, 200 F.3d 597, 600-

01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  Moreover, we are bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

III.  **Review of Petitioner's Claims**

    A.    **Claim One: Ineffective Assistance of Counsel in Failing to Object to Expert Testimony**

In his first claim, Petitioner asserts his trial defense counsel's failure to object to certain testimony of Registered Nurse Georgeanne Greene constitutes ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments of the United States Constitution.  During trial, Greene testified on direct examination that the victim's physical condition was not consistent with someone who had not suffered sexual abuse.  Petitioner asserts this testimony was improper for an witness and that the failure of his trial counsel to object to this testimony prejudiced his defense.

        1.    Clearly Settled Supreme Court Law

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the Petitioner must demonstrate counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The Petitioner must show counsel's representation fell below and objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgement considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

7

1  (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges
2  a strong presumption that counsel's conduct falls within the wide range of reasonable
3  professional assistance. Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th
4  Cir. 1994).

5  Second, the Petitioner must demonstrate "there is a reasonable probability that, but for
6  counsel's unprofessional errors, the result...would have been different." 466 U.S. at 694.
7  Petitioner must show counsel's errors were so egregious as to deprive Petitioner of a fair trial,
8  one whose result is reliable. STrickland, 466 U.S. at 688. The court must evaluate whether the
9  entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id;
10 Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

11 A court need not determine whether counsel's performance was deficient before
12 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.
13 Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any
14 deficiency not resulting in prejudice must necessarily fail. However, there are certain instances
15 that are legally presumed to result in prejudice, e.g., where there has been an actual or
16 constructive denial of the assistance of counsel or where the State has interfered with counsel's
17 assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S. at 659, n. 25
18 (1984).

19 Ineffective assistance of counsel claims are analyzed under the "unreasonable
20 application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d
21 1058, 1062 (2000).

22 .2  State Court Review

23 Petitioner's claim was first presented before the Fifth DCA. The Fifth DCA denied
24 Petitioner's ineffective assistance claim because "the evidence was proper expert opinion
25 testimony and thus not objectionable." Fifth DCA Op. at p. 2. Citing California law, the Fifth
26 DCA noted that trial counsel is not ineffective for failing to raise a meritless objection. Id.
27 Petitioner asserted witness Greene's testimony was objectionable because: (1) it
28 impermissibly commented on the credibility of the victim; and (2) it was not based on adequate

8

knowledge, since Greene had not studied physically active children who had not reported sexual abuse.

With respect to the first claim, the Fifth DCA noted that the nurse's testimony as to the physical condition of the victim's genitalia "[o]bviously...supported the victim's testimony that she had been molested." Id. at 3. However, the Fifth DCA noted that under California law otherwise admissible expert witness evidence is not rendered inadmissible simply because it encompasses an ultimate issue such as victim credibility. Id. The Fifth DCA noted that witness Greene did not opine as to whether the crime had been committed, nor did she offer an opinion as to the credibility of the victim. Id. Instead, she simply offered testimony "indistinguishable from the type of evidence routinely and properly admitted in the courts of this state." Id. Accordingly, the Fifth DCA found the testimony was proper and any objection thereto would have been futile.

With respect to Petitioner's contention that witness Greene's testimony was improper due to her not having studied physically active children who had not reported abuse, the Fifth DCA found Petitioner's claim to be without merit. Petitioner's trial counsel asked Greene on cross-examination whether it was unusual to find injuries such as the victim's in active children. Greene responded "That's hard to say because I rarely get to examine children with a colposcope unless they are sent to me for ... the possibility of sexual assault; so I can't really say that I have done a study that has looked at a bunch of very active children." Greene explained that although the hymen of a child of the victim's stage of development was easily injured, generally such injury would not be the result of physical play, because the hymen is located inside the female genitalia. She went on to acknowledge that such an injury could occur by an act other than abuse if a child fell on a sharp object with her legs spread exactly right such that the injury was directly to the hymen.

The Fifth DCA found witness Greene to be "highly qualified," with extensive specialized training and experience conducting sexual assault examinations. She had conducted over 350 exams, 250 of which involved victims reporting vaginal penetration. During her training she had viewed pictures of children who had not complained of sexual assault as well as examining

children who had made such complaints. The Fifth DCA found that it was a matter for the jury to determine how much weight to give her testimony, given her admission that she had not examined physically active children who had not reported sexual abuse.

Having found Petitioner failed to demonstrate his trial counsel's performance was deficient, The Fifth DCA rejected Petitioner's ineffective assistance claim.

### 3   Analysis of Petitioner's Claim

We find the state courts reasonably applied the standard articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The Fifth DCA found, and We agree, that Greene's testimony was "'indistinguishable' from the type of evidence routinely and properly admitted in the courts of this state." Fifth DCA Op. at p. 4. She expressed her opinion that the victim's injuries were consistent with sexual abuse through digital penetration. She avoided improperly opining as to either the credibility of the victim or whether the assault had occurred. Granted Greene's testimony bolstered the victim's credibility; however, under California law expert witness testimony is admissible even though it may encompass an ultimate issue such as victim credibility. <u>See</u> Fifth DCA Op. at 3, citing Cal. Evid. Code § 805. As such, the failure of Petitioner's trial counsel to object does not constitute ineffective assistance. <u>See</u> <u>United States v. Quintero-Barraza</u>, 57 F.3d 836, 841 (9th Cir. 1995) (failure to raise a meritless objection is not ineffective assistance); <u>James v. Borg</u>, 24 F.3d 20, 27 (9th Cir. 1994) (same); <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005) (same).

Likewise, any objection on the basis of Greene's lack of experience examining physically active children who had not reported sexual abuse would have been meritless. As the Fifth DCA found, witness Greene was a highly qualified member of SART, with extensive specialized training and experience conducting sexual assault examinations. She had conducted over 350 such examinations, 250 of which had involved allegations of vaginal penetration. On cross-examination she admitted she had not studied a group of physically active children who had not reported sexual abuse, but that she had studied pictures of children who had not complained of sexual assault during the course of her training. It was for the jury to consider what weight, if any, to give her testimony. Because any objection to her testimony on the basis of her alleged

lack of experience examining non-abused children would be meritless, trial counsel's failure to raise such an objection does not constitute ineffective assistance of counsel.

Accordingly, Petitioner's claim should be denied.

**B.    Claim Two: Ineffective Assistance of Counsel in Failing to Object to the Trial Testimony of the Victim**

In his second claim for relief, Petitioner asserts his trial counsel was ineffective within the meaning of the Sixth Amendment for failing to object to the testimony of the victim at trial. In particular, Petitioner claims trial counsel was deficient in failing to object to the following: (1) the victim admitted lying about Petitioner pulling her into his bedroom (RT 143); (2) the victim admitted lying to Detective Robel by not telling him that Petitioner put his fingers inside of her (RT 95); and (3), the victim admitted lying during an interview with the police because she thought she could get away with it (RT 125).  In addition, Petitioner claims the victim admitted having help with her answers during an interview and that her description of the act of digital penetration was "improbable." (Pet. at 21).

   1.    Clearly Settled Supreme Court Law

The standard for reviewing ineffective assistance of counsel claims is articulated *supra*, section III(A)(1).

   2.    State Court Review

Petitioner first raised this claim before the Tulare County Superior Court in a petition for writ of habeas corpus. The state court found that Petitioner's counsel was not ineffective for failing to object to the victim's testimony because the victim's testimony would not have been found inadmissible.[1] Her prior inconsistent statements and/or admitted lies were brought to the attention of the jury during her witness examination.

Petitioner subsequently brought this claim to the Fifth DCA and California Supreme

---

[1] The state court mistakenly stated the victim's testimony "would not have been admissible." Given the context of the court's statement, it is clear the court meant to say that the testimony would not have been *in*admissible.

11

Court, both of which denied the claim without comment.

### 3. Analysis of Petitioner's Claim

The determination of the state court is not an unreasonable application of the standard articulated in Strickland. Petitioner claims that defense counsel was ineffective in failing to object to the testimony of the victim on the grounds that she was lying and that her testimony was improbable. However, this is not a proper basis upon which to exclude witness testimony. Witness credibility is an issue for the jury to consider, and the trial judge properly instructed the jury on this point. See CALJIC No. 1.00 [Duties of the Jury and the Judge] (RT 242-243); CALJIC No. 2.13 [Prior Consistent or Inconsistent Statements] (RT 248); CALJIC No. 2.20 [Believeability of a Witness] (RT 248-249). As noted above, trial counsel is not ineffective for failing to raise a meritless objection.

Furthermore, there were valid tactical reasons for defense counsel not to object to the evidence in question. Far from being prejudicial to the defense, admission of the victim's testimony that she had lied in the past provided Petitioner's trial counsel with valuable impeachment evidence. Defense counsel used this evidence during closing arguments to portray the victim as untrustworthy. Defense counsel highlighted the conflict in testimony between witnesses and reminded the jury of their duty to weigh witness credibility. Counsel recounted the victim's lie to Detective Robel and asserted that she had lied because the acts alleged had never occurred. This was a valid tactical decision on the part of trial counsel and accordingly does not constitute ineffective assistance.

Petitioner also cites as ineffective his counsel's failure to follow up after getting the victim to admit during cross examination that she had lied to police because she thought "that if I lied I could get away with things." (RT 126-127). As respondent correctly notes, not inquiring as to what the victim thought she might get away with was a valid tactical decision – asking the follow up question would have permitted the victim to rehabilitate herself after this admission that she had prevaricated.

Similarly, Petitioner argues defense counsel was ineffective for failing to object to the victim's testimony on the grounds that she had help during her interview and that her description

of the digital penetration was "so improbable." As with her admissions that she had lied to police, defense counsel made the tactical decision to elicit from the victim admissions that her father was with her during her videotaped interview and that she was able to look at him to help her out with some of her answers to police questioning. (RT 125, 304). During closing arguments defense counsel used this testimony to raise the possibility that the victim had been coached to the jury's attention. (RT 304-305). With respect to the improbability of the victim's description of the digital penetration, any objection thereto would have been meritless, as it is for the jury to decide whether a witness' version of the events is or is not credible.

Because any objection by defense counsel would have been without merit, and because defense counsel had valid tactical reasons for allowing the admission of this testimony at trial, his failure to object to the admission of the victim's testimony does not constitute ineffective assistance of counsel. Accordingly, Petitioner's claim should be denied.

### C.   Claim Three: Insufficient Evidence to Support Conviction

In his final claim for relief, Petitioner asserts that based on the evidence advanced at trial, no rational trier of fact could have found him guilty beyond a reasonable doubt. (Pet at 5R). Specifically, Petitioner alleges the testimony of the victim was tainted by inconsistencies and admitted lies, and the testimony of witness Greene did not rule out the possibility that the victim's injuries were caused by normal active child's play or by some means other than sexual abuse.

#### 1.   State Court Review

Petitioner first presented this claim to the Tulare County Superior Court in a petition for writ of habeas corpus. The Superior Court rejected the claim, stating Petitioner had failed to make a prima facie showing that relief is justified. (Sup. Ct. Habeas Op. at 8). Subsequently, Petitioner presented this claim in habeas petitions to the Fifth DCA and California Supreme Court. Both state courts denied the claim without comment.

#### 2.   Clearly Settled Supreme Court Law

Under the circumstances, this Court makes an independent review of the record and relevant federal law to determine whether the state courts' resolution of Petitioner's claim was

contrary to or an unreasonable application of clearly settled law.

The controlling test for sufficiency of the evidence claims is that articulated in Jackson v. Virginia, 443 U.S. 307 (1979). *See* People v. Johnson, 26 Cal.3d 557, 575-578 (1980); *see also* People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency of evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324, n.16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

### 3. Review of Petitioner's Claim

Under California law, a person residing in the home of a minor child who over at least a three-month period of time commits three or more acts of lewd conduct with a child under the age of 14 years is guilty of the crime of continuous sexual abuse. Cal. Pen. Code § 288.5(a). The jury was instructed pursuant to CALJIC No. 10.42.6 on the prosecution's burden to prove:

> (1) A person was a resident in the same house with a minor child or had reoccurring access to a minor child; and
> (2) That person had over a period of time, not less than three months in duration, engaged in either three or more acts of substantial sexual conduct or three or more lewd acts or lascivious conduct with the child under the age of 14 years at the time of the commission of the sexual or lewd conduct.

(RT 254-256; CT 148).

Reviewing the evidence in the light most favorable to the prosecution, We conclude a

1  rational trier or fact could have found the essential elements of the crime beyond a reasonable
2  doubt.  The victim testified that she resided in the same house as Petitioner, and that he began
3  touching her inappropriately during the summer before she started fourth grade.  (RT 78, 83).
4  The victim stated that Petitioner touched her approximately once a week.  The contact included
5  rubbing and squeezing her and touching her breasts underneath her clothing (RT 81-82, 84-85).
6  The victim testified that on one occasion, while sitting on Petitioner's lap, Petitioner put his
7  fingers into her vagina, causing her pain.  She fell from his lap.  After getting up, Petitioner
8  removed his fingers and put them in his mouth.  (RT 85-86).

9        The victim further testified that on one occasion she saw Petitioner touching his penis
10 while she was inside his room, and that his penis was pointed away from his body.  (RT 87-88).
11 She further testified that she had seen Petitioner's penis on other occasions.  (RT 89).  The victim
12 also testified that Petitioner had showed her pictures of naked women.  (RT 89).

13       The victim testified that Petitioner stopped touching her before she moved away to live
14 with her father in January of 2001.  (RT 90).  She believed her counselor was the first person she
15 told about the inappropriate contact.  She later told a police officer who videotaped the statement
16 (RT 92-93).  The victim admitted that she had lied when she told the police officer that Petitioner
17 had pulled her into his bedroom.  (RT 126, 143).  She testified that she lied because after learning
18 that what Petitioner had done to her was wrong, she did not like him anymore.  (RT 142-143).
19 Despite this, she insisted that she was not "making it up about [Petitioner]."  (RT 138).

20       In addition to the testimony of the victim, registered nurse Georgeanne Greene testified as
21 a prosecution witness.  Greene examined the victim for physical signs of sexual assault.  (RT 10).
22 Greene was specially trained in such examinations; her training specifically included performing
23 exams on children.  She had conducted approximately 350 pediatric sexual assault examinations.
24 (RT 11-12).  Greene's examination revealed that the victim had a scar crossing the posterior
25 fourchette and a notch or tear in the hymen.  (RT 17).  Greene's training taught her to distinguish
26 normal anomalies in the hymen from injuries.  In her opinion, the condition of the victim's
27 hymen was consistent with penetration.  (RT 19).  Green testified that it was unlikely an injury
28 such as the victim's would occur from such activities as falling on a bike rail, off a fence, or

falling on monkey bars, because of the position of the hymen.  (RT 23).  Greene testified that an injury such as the victim's could possibly have occurred if a child fell on a sharp object with legs spread in an exact position so as not to injure any other part of the genitalia.  (RT 30).

Greene testified that the victim told her Petitioner had "put his finger in her privates." The victim stated that the penetration was painful and that it was painful later when she urinated. (RT 20-21).  The victim told Greene no one other than Petitioner had ever touched her inappropriately.  (RT 29).

Greene testified that she had examined approximately 250 girls complaining of vaginal penetration.  She had not examined girls not complaining of sexual assault, but had studied photographs of the genitalia of such children as part of her training.  The injuries to victim's genitalia were not consistent with those of a child who did not complain about having been sexually assaulted.  (RT 32-33).

Greene stated that she did not question the victim as to whether she masturbated.  She testified it was unlikely the injury was caused by masturbation, because female masturbation involves the clitoral hood at the top of the genitalia and would not result in a tear of the hymen. Greene testified that most children of the victim's stage of development would not touch themselves there because it would be very painful.  (RT 21, 34).

The Court notes that the victim's testimony was subject to impeachment due to her admissions that she had previously lied to the police about some of the particulars of Petitioner's actions.  However, it was well within the province of the trier of fact to determine whether it believed the testimony of the victim in spite of these admissions.  Viewing the evidence in the light most favorable to the prosecution, We find the testimony of the victim, particularly as it was bolstered by the testimony of the examining nurse as to the physical evidence of sexual assault, constitutes sufficient evidence such that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Accordingly, Petitioner's claim should be denied.

**RECOMMENDATION**

The Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be

1  DENIED and the Clerk of the Court be DIRECTED to enter judgment.

2      These Findings and Recommendations are submitted to the Honorable Lawrence J.
3  O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636
4  (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court,
5  Eastern District of California.

6      Within thirty (30) days after being served with a copy, any party may file written
7  objections with the court and serve a copy on all parties.  Such a document should be captioned
8  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections
9  shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after
10 service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
11 28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the
12 specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951
13 F.2d 1153 (9th Cir. 1991).

14

15 IT IS SO ORDERED.

16 **Dated:**   **February 12, 2008**                    **/s/ John M. Dixon**
                                               UNITED STATES MAGISTRATE JUDGE
17
18
19
20
21
22
23
24
25
26
27
28

cd

17